UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES,<br><br>      Plaintiff,<br><br>vs.<br><br>CHRISTOPHER NELSON,<br><br>      Defendants. | Case No. 2:11-cr-142-PMP-CWH<br><br>**ORDER**<br><br>**Report and Recommendation re Defendant's Motion to Suppress (#27)** |

   This matter is before the Court on Defendant's Motion to Suppress Evidence (# 27), filed on August19, 2011, the Government's Response in Opposition to Defendant's Motion to Suppress Evidence (# 29), filed on August 31, 2011, and Defendant's Reply to Government's Response to Motion to Suppress Evidence for Fourth Amendment Violation (#30), filed September 12, 2011. The Court conducted an evidentiary hearing on September 16, 2011.

**FACTUAL BACKGROUND**

   The Indictment (#1) charges that on or about November 12, 2010, Defendant Christopher Nelson, a person having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The charges arise from a traffic stop and subsequent search of Defendant's vehicle which resulted in the discovery of the firearm.

**1. Testimony of Officer J. Delatore**

   On November 12, 2010, Las Vegas Metropolitan Police Department ("LVMPD") Officer Delatorre was patrolling by himself in the area of Bruce Street and Sahara Avenue in Las Vegas, Nevada in a marked

patrol car. Bruce Street is perpendicular to Sahara Avenue. Officer Delatorre testified that he observed a blue Mercury Grand Marquis bearing Nevada license 225WNK, driving northbound on Bruce. He further testified that he was directly behind the vehicle as it turned left onto Sahara Avenue without using a turn signal. Officer Delatorre followed the car for a short distance, notified dispatch of the vehicle's license plate number, and at 10:10 pm, initiated a traffic stop of the vehicle. The stop occurred in a dedicated left hand turning lane westbound on Sahara prior to Maryland Parkway. Officer Delatorre testified that the sole purpose for the stop was Defendant's alleged failure to use a turn signal. Officer Delatorre approached the vehicle on the driver's side of the vehicle, made contact with the driver, who was the sole occupant of the vehicle. He requested and obtained the driver's license, registration, and insurance, all of which he later determined were valid. Upon reviewing the driver's license, he testified that he immediately recognized the driver as Christopher Nelson who is an ex-felon, and requested that another officer be dispatched to the scene for "officer safety." He testified that after Officer Pepper arrived at the scene, about 20 minutes after the initial stop, he removed Defendant from the vehicle and placed him in front of the patrol car, which was parked immediately behind Defendant's vehicle. After removing Defendant from his vehicle and placing him in front of the patrol car, Officer Delatorre conducted a pat-down search of Defendant, and found nothing illegal or dangerous. Upon completion of the pat-down search, Officer Delatorre reviewed the SCOPE report which confirmed that Defendant was an ex-felon with no pending warrants. Officer Delatorre testified that after Officer Pepper arrived, he asked for Defendant's consent to search the vehicle. After receiving consent, Officer Delatorre testified that Defendant spontaneously stated, "If there is anything illegal in there, it would be on the front seat."

Officer Delatorre testified that he approached Defendant's vehicle from the driver's side of the vehicle, and discovered a black zippered bag on the front, bench seat of the vehicle. He further testified that he opened the zipper of the bag and observed a large frame semi-automatic pistol which was lying in a position that allowed him to read the serial number without manipulating the pistol. He recorded its serial number, and then immediately terminated the search and conducted a police records check of the firearm based on the serial number, and found that it had been reported stolen. Consequently, at *11:20 pm*, Officer Delatorre requested the assistance of a LVMPD firearms expert to aid with the investigation.

On cross-examination, Officer Delatorre testified that he followed Defendant's vehicle as it proceeded north to the intersection of Bruce and Sahara, observed that the light was green, and that Defendant did not stop as he made the lefthand turn from Bruce to Sahara without using a turn signal or "blinker." Officer Delatorre further testified that Bruce Street continues through Sahara Avenue, and that it is not a "T" intersection. He testified that there was no traffic on Sahara Avenue or Bruce Street which was impacted by Defendant's turn, that his police squad car was not impacted by the turn, that no pedestrians were impacted by the turn, and that the turn was executed in a reasonably safe manner. On redirect examination, Officer Delatorre stated that he did not recall the traffic on Sahara that night. Officer Delatorre confirmed that, although Defendant was not charged with any traffic infraction as a result of the stop, he believed that the traffic infraction that he observed which supported the initial stop was that the driver failed to signal his intent to turn 200 feet before turning. Officer Delatorre testified that he could not see the driver of the vehicle because of the dark tint on the windows, and did not know that it was Defendant who was driving the vehicle at the time he initiated the stop. Officer Delatorre made no written police report regarding the incident.

**2. Testimony of Officer J. Pepper**

LVMPD Officer J. Pepper testified that he arrived at the scene at approximately 10:30 p.m. in response to a request made by dispatch. When Officer Pepper arrived, he testified that Defendant Nelson was already located in front of Officer Delatorre's patrol car. Officer Delatorre informed Officer Pepper that he wanted to obtain consent to search Defendant's vehicle. He then heard Officer Delatorre ask for consent, and heard Defendant consent to the search. Although he had the clear impression that Defendant gave consent for the search, Officer Pepper testified that he could not recall the precise question asked by Officer Delatorre to obtain Defendant's consent. Officer Pepper heard Officer Delatorre ask Defendant whether there was anything illegal in the vehicle, and heard the Defendant say words to the effect that "if there were anything illegal it would be on the passenger seat." He also observed Officer Delatorre approach the vehicle from the passenger side of the vehicle and was instructed by Officer Delatorre to handcuff Defendant after the firearm was found in Defendant's vehicle pursuant to the consensual search.

On cross-examination, Officer Pepper reviewed a photograph of the intersection (Exhibit A), and testified that he believed there was a stop sign, not a traffic light, at the intersection of Bruce Street and

1  Sahara. He also testified that based upon the photograph, he believed that it was a T-intersection and that
2  Bruce Street does not continue past Sahara Avenue. Pepper made no written police report regarding the
3  incident.

### 3. Testimony of Detective R. Orth

LVMPD Detective R. Orth, a detective in LVMPD's firearms detail, testified that he arrived at the scene at approximately 12:03 a.m. on November 13, 2010. Based on his discussions with Officer Delatorre, Detective Orth prepared an application for a search warrant, obtained the warrant from Judge T. Williams, and executed the search warrant, which resulted in the seizure of the .45 Sig Sauer pistol.[1]

### 4. Testimony of Mr. Craig Retke

Defendant called Mr. Craig Retke (Retke), a retired LVMPD officer with 17 years of experience, who is now a private investigator. Retke testified that he investigated the traffic control devices at the intersection of Bruce Street and Sahara Avenue. He testified that the intersection is a T-intersection with a stop sign at Bruce Street, not a traffic light. He was not aware of whether there was a light at the intersection on November 12, 2010.

### 5. Testimony of Defendant Christopher Nelson

Defendant Christopher Nelson also testified on his own behalf at the suppression hearing. He testified that on November 12, 2010, he entered Bruce Street from an apartment complex about 100 yards south of the Bruce Street and Sahara Avenue intersection. He testified that he recognized that a police patrol car was behind him on Bruce Street, and that he is familiar with the intersection since he frequently travels there. He testified that he came to a complete stop at the intersection; that the intersection was controlled by a stop sign not a traffic light; that he used his blinker as he entered the intersection and turned left onto Sahara; and that the Bruce Street and Sahara Avenue intersection is a T-intersection. He further testified that he was removed from the vehicle and required to place his hands on the squad car during the entire incident, and that he never consented to the search of his vehicle or said anything about an illegal item being found on the front seat of the vehicle.

---

[1] Detective Orth also located a small baggie containing a substance later confirmed to be 0.4 grams of methamphetamine and a black digital scale under the front seat of the vehicle. No charges resulted from the seizure of these items.

**DISCUSSION**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States,* 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." *Id.* Evidence obtained in violation of the Fourth Amendment, and evidence derived from it, may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963). Defendant Nelson argues that his Fourth Amendment rights were violated because the LVMPD officer did not have probable cause or reasonable suspicion to stop his vehicle. He also argues that he did not voluntarily and knowingly consent to a search of the vehicle.

**1. Validity of the Initial Traffic Stop.**

A police officer who has reasonable suspicion or probable cause to believe that a violation of traffic laws has occurred may stop the vehicle to investigate the infraction. *Whren v. United States*, 517 U.S. 806, 812-3 (1996); *see also United States v. Lopez-Soto*, 205 F. 3d 1101, 1104-05 (9th Cir. 2000). In this case, the government has the burden of proving by a preponderance of the evidence that Officer Delatorre had lawful grounds to stop Defendant's vehicle and that his subsequent search of Defendant's vehicle complied with the Fourth Amendment. *See United States v. Cortez-Rivera*, 454 F.3d 1038, 1041-42 (9th Cir. 2006); *see also United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991) (*per curiam*); *United States v. Marshall*, 488 F.2d 1169, 1186 (9th Cir. 1973).

Officer Pepper, Mr. Retke, and Defendant all testified, and the photograph of the location confirms, and the Court finds, that the intersection of Bruce Street and Sahara Avenue was a T intersection controlled by a stop sign, not a through street controlled by a lighted traffic signal. Officer Delatorre's testimony that he stopped Defendant because he entered the intersection on a green light without stopping at the intersection, and failed to signal his turn, is not credible simply because there is no such traffic light at the identified intersection, there is a stop sign. Given that Defendant was traveling directly in front of the patrol car, it is reasonable to assume that if Defendant ran a stop sign as he drove into the intersection, that potentially dangerous infraction would have been noticed by Officer Delatorre.

Ultimately, although it is part of his normal operating area, Officer Delatorre could not accurately recall that the incident occurred at a T-intersection. He was also unclear regarding the traffic conditions,

first testifying with certainty that he remembered, and then later recanting that testimony and saying that he did not remember. The credibility of the testimony that Defendant failed to use his left turn signal "blinker" in making that turn is necessarily connected to the same faulty recollection. This is a material aspect of his testimony, and the testimony is not credible. The Court therefore finds that the Government has failed to meet its burden to prove that Defendant failed to make a left turn signal.

Even without this adverse credibility determination, however, the result is the same. According to Officer Delatorre, the traffic infraction which justified the stop was Defendant's failure to signal within 200 feet of his intended turn. The requirements for turning on a highway are provided in NRS 484B.413, which provides, in pertinent part:

> 1. A driver shall not turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety, and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such movement and <u>after giving an appropriate signal if any other vehicle may be affected by such movement</u>.
>
> **2.** A signal of intention to turn right or left, or otherwise turn a vehicle from a direct course, shall be given continuously during not less than the last 100 feet traveled in a business or residential district and not less than the last 300 feet traveled in any other area prior to changing the course of a vehicle. This rule shall be observed, regardless of the weather.

*Emphasis added*. Consistent with *United States v. French*, 2010 U.S. Dist. LEXIS 44054, the Court finds that the NRS 484B.413(1) signal requirement is conditional and the use of a turn signal is only required "if any other vehicle may be affected by such movement."

Here, Officer Delatorre testified that Defendant's turn was executed in a "reasonably safe" manner, and that no other vehicles from any direction, including his own, were affected by the turn. In *United States v. French*, 2010 U.S. Dist. LEXIS 44054, the court stated:

> NRS § 484.343.1[2] requires a driver to make a turn signal when turning at an intersection or making a lane change if other traffic may be affected by the movement. It may be reasonable to infer that other traffic is affected when a driver makes a turn or lane change without signaling on a busy street or intersection. *See United States v. Dulaney,* 2007 U.S. Dist. LEXIS 15931, 2007 WL 680785 (D. Nev. 2007) (holding that officer had probable cause under NRS § 484.343.1 to stop a vehicle that crossed over three lanes of travel on a major thoroughfare at noontime without signaling.) Such an inference is not reasonable, however, where, as here, there is no reason to believe that other traffic was present or affected by the turn.

---

[2] Now compiled as NRS 484B.413.

1  2010 U.S. Dist. LEXIS 44054 at *3. Officer Delatorre was unable to identify the precise NRS provision upon which he relied in making his stop, but testified that the stop was based upon "the failure to signal within 200 feet of the turn." NRS 484B.413(2) appears to be the statute related to Officer Delatorre's concern. Noticeably, that section does not repeat the requirement that another vehicle be "affected" by the turn as set forth in NRS 484B.413(1).

As with *French*, at least one other court has construed a substantially similar statute,[3] under identical circumstances to require that other traffic be affected by the turn. In *S.A.S. v. State*, 884 So. 2d 1167 (Fla.App. 2004) a juvenile was stopped for failure to use his turn signal when making a left turn at a "T" intersection, and inculpatory evidence was seized during the stop. The court interpreted the statute to require a signal only when another vehicle will be affected by the turn, and further found that the second section of the statute, regarding the need to signal an intention to turn within 100 feet before turning, must be read *in pari materia* to require a signal only when another vehicle would be affected by the turn from the highway. *S.A.S. v. State*, at 1169. *See also*, *United States v. Bias*, 2008 U.S. Dist. LEXIS 84790 (E.D. Tenn. Oct 20, 2008) (interpreting similar statute to require impact on other traffic before signal required, evidence suppressed because there was no impact on traffic). Nevada's statute should be similarly interpreted, otherwise the specific requirement of NRS 484B.413(1) that a signal is required "if" traffic is affected would be rendered superfluous and nullified by the requirement in NRS 484B.413(2) which appears to provide that *all* turns require a signal *regardless* of impact on traffic. Statutory interpretations that "render superfluous other provisions in the same enactment" are strongly disfavored. *Freytag* v. *Commissioner,* 501 U.S. 868, 877 (1991) (internal quotation marks omitted).

---

[3] Section 316.155, Florida Statutes (2003), delineates the requirements for using a turn signal:
(1) No person may turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety, and then only after giving an appropriate signal in the manner hereinafter provided, in the event any other vehicle may be affected by the movement.

(2) A signal of intention to turn right or left must be given continuously during not less than the last 100 feet traveled by the vehicle before turning, except that such a signal by hand or arm need not be given continuously by a bicyclist if the hand is needed in the control or operation of the bicycle.

1 Moreover, even assuming that Officer Delatorre held a mistaken belief of the law regarding the use of turn signals, and assuming that such a belief was in good faith, there is no good faith exception to the exclusionary rule for police who do not act in accordance with governing law. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000) (citing *United States v. Gantt*, 194 F.3d 987, 1006 (9th Cir. 1999)). "To create an exception here would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey." *Id*.

Defendant also claims that the traffic stop was pretextual, and therefore violated the Fourth Amendment. The reasonableness of the traffic stop does not depend on the actual motivations of the individual officer involved. *See Whren v. United States*, 517 U.S. 806, 813 (1996). "Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." *Id*. *See also, Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) ("Efficient and evenhanded application of the law demands that we look to whether the arrest is objectively justified, rather than to the motive of the arresting officer.") Accordingly, the Court rejects Defendant's pretextual search claim.[4]

The Court finds that the government has failed to establish by a preponderance of the evidence that Officer Delatorre possessed either the reasonable suspicion or probable cause necessary to justify the traffic stop.

**2. Defendant's Claim that he did not Consent to the Vehicle Search.**

Although the finding that Officer Delatorre did not have probable cause to make the traffic stop is sufficient to suppress the evidence found during the search of Defendant's vehicle, the Court will address the additional claim presented by the Defendant that he did not consent to the search of his vehicle.

Defendant denied that there were any discussions regarding consent to search his vehicle or the existence of anything illegal in his vehicle. Officer Delatorre testified that he asked for Defendant's oral

---

[4] Moreover, Defendant's claim is not supported by the facts. Contrary to Defendant's claims, Officer Delatorre was not participating in Project Safe Neighborhood, which is designed to "get guns off the streets," he had not recognized Defendant from past encounters, he did not know Defendant's identity or his previous criminal record before he initiated the stop. Officer Delatorre testified that he decided to conduct the traffic stop before he ran Defendant's license plates, and that because of the dark tint on the vehicle windows, he could not see Defendant until after the stop was completed.

consent to search the vehicle, and was given permission. Officer Pepper clearly recalled that Defendant gave his consent, but did not recall the precise question asked by Officer Delatorre. Officer Pepper also clearly recalled that Defendant made a statement to the effect that if there were anything illegal, it would be on the passenger seat.[5]  The government has the burden of demonstrating that consent to a warrantless search was voluntary. Voluntariness is a question of fact to be determined from all the surrounding circumstances. When viewing the surrounding circumstances, "there is no single controlling criterion." *United States v. Agosto*, 502 F.2d 612, 614 (9th Cir. 1974) (per curiam) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, at 226) (issue of voluntariness "remains a question of fact for determination upon the totality of the circumstances"). In evaluating whether consent to a search is voluntary, the Court must consider: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn, (3) whether *Miranda* warnings were given; (4) whether the individual was told he had the right not to consent; and (5) whether the individual was told that a search warrant could be obtained. *United States v. Cormier*, 220 F.3d 1103; 1112, (9th Cir. 2000). None of these factors is dispositive. *United States v. Castillo*, 566 F.2d 1071, 1082 (9th Cir. 1988).

Defendant claims that he was in custody at the time consent to search was requested. It is true that upon the initial stop, Defendant was not free to leave. A traffic stop is an investigative detention and, therefore, a seizure within the meaning of the Fourth Amendment, *United States v. Sharpe*, 470 U.S. 675, 682 (1985). When Officer Delatorre learned that Defendant was an ex-felon with a prior record for weapons-related offenses, he requested a back-up, and waited for the back-up to arrive before continuing his investigation. Defendant was detained from about 10:10 p.m. until about 10:30 p.m. when Officer

---

[5] Defendant also claimed that his Fifth Amendment rights were violated when he made this statement. "The roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute a "custodial interrogation" for the purposes of the *Miranda* rule. Although an ordinary traffic stop curtails the 'freedom of action' of the detained motorist and imposes some pressures on the detainee to answer questions, such pressures do not sufficiently impair the detainee's exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." Moreover, under these facts, the evidence would inevitably have been located. See *United States v. Mejia*, 69 F.3d 309, 319 (9th Cir. 1995). *And see United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989) ("by following routine procedures, the police would inevitably have uncovered the evidence."). Here, Defendant had consented to the search of his vehicle before he allegedly made the incriminating remark, and the illegal weapon was quickly and easily located on the passenger seat of the vehicle.

Pepper arrived at the scene, at which time he asked for Defendant's consent to search his vehicle. There is no definitive rule on the time limit for a lawful investigative detention. *United States v. Torres-Sanchez*, 83 F.3d 1123, 1128 (9th Cir. 1996). Rather, courts undertake a fact-specific inquiry, based on the totality of the circumstances, to determine whether the detention is reasonable. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Law enforcement officers are not required to move at top speed when executing a traffic stop. *United States v. Turvin*, 517 F.3d 1097, 1102 (9th Cir. 2008). "The critical inquiry is whether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Sharpe*, 470 U. S. at 686. Officer Delatorre's decision to summon back-up for officer safety before continuing his traffic investigation was reasonable under the circumstances, and the 20 minute delay for this purpose did not transform Defendant's temporary detention into custody.

Nor did Officer Delatorre place Defendant in custody when he ordered him out of the vehicle. In *Pennsylvania v. Mimms*, 434 U.S. 106, n. 6 (1977) (per curium) the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment." Law enforcement's legitimate and weighty interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver that is already lawfully stopped to exit the vehicle. *Mimms*, 434 U.S. at 110-11. This is precisely such a case – Defendant had been identified as a former convicted felon, and his removal from the vehicle was appropriate.

*Miranda* warnings were not given, but none were required because Defendant was not in custody. It is true that Defendant was not advised of his right to refuse consent, nor was he advised that a search warrant would be obtained if he did not consent. Defendant testified that, as a former convicted felon, he was well aware of this rights to withhold consent to the search, which is why he would have refused to consent had the issue been raised. On balance, the Court finds that the government has met its burden to demonstrate that Defendant's consent to search his vehicle was voluntary, however, such consent does not cure the lack of probable cause for the traffic stop.

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant Nelson's Motion to Suppress Evidence for Fourth Amendment Violation (#27) be **granted** in regard to the evidence seized as a result of the traffic stop

and search and seizure that occurred on November 12, 2010.

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.,* 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 27th day of September, 2011.

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**